UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTOPHER SCARPA,<br>    *Plaintiff*,<br>    *v.*<br>PROVIDENCE & WORCESTER RAILROAD, INC. and<br>METRO-NORTH RAILROAD COMPANY,<br>    *Defendants.* | Civil No. 3:17cv2107 (JBA)<br><br>August 3, 2020 |

**RULING DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Christopher Scarpa brings claims against Defendants Providence & Worcester Railroad Company ("P&W") and Metro-North Commuter Railroad Company ("Metro-North") under the Federal Employers' Liability Act ("FELA") and the Locomotive Inspection Act ("LIA") for injuries suffered while employed by P&W as a train conductor. Defendants move for summary judgment on all counts of Plaintiff's complaint. (Defs.' Mot. for Summ. J. [Doc. # 60].) For the reasons that follow, Defendants' motion is denied.

**I.  Background**

Plaintiff Christopher Scarpa is employed as a railroad conductor by Defendant P&W. (Parties' L.R. Stmts. [Docs. ## 60-15, 68, 73] ¶ 1.) Plaintiff was hired by P&W in 2013 and completed "extensive classroom and on-the-job training regarding safe railroad operating practices and railroad safety rules." (*Id.* ¶¶ 2, 5.) P&W's safe operating practices during the relevant time period required him to "use care to prevent injury to [him]self or others," to "be alert and attentive at all times when performing [his] duties," to "plan [his] work to avoid injury," and to "protect [his] own safety." (*Id.* ¶ 3.) As a train conductor, Plaintiff was "responsible for . . . the safety and care of [his] train," which included an explicit requirement to "protect company property," including radio equipment. (*Id.* ¶¶ 82-83.)

P&W acquired Locomotive 4301 and modified it to meet Metro-North's height clearance requirement. (*Id.* ¶¶ 6-10.) Metro-North inspected Locomotive 4301 after those modifications and "approved it to enter into service on Metro-North's tracks." (*Id.* ¶ 11.)

Following the modifications, Locomotive 4301's height measured fifteen feet, four and three-eighths inches. (*Id.* ¶ 12.) The height clearance requirement was fifteen feet, six inches. (*Id.*) Locomotive 4301 "had 3 radio antennas" in various locations. (*Id.* ¶ 54-56.) Prior to Plaintiff's accident, antennas on Locomotive 4301 had been damaged several times and had been replaced by a P&W employee. (*Id.* ¶¶ 57-60.)

On the evening of March 5, 2017, Plaintiff was working with Engineer Matthew Pilipaitis in Locomotive 4301 to deliver a train from New Haven, Connecticut, to Fresh Pond, New York. (*Id.* ¶ 13.) "When Engineer Pilipaitis observed the first of a series of low bridges as they entered New York, he and the plaintiff joked that they should get ready to duck because they were sitting up higher and they thought the roof was going to come off." (*Id.* ¶ 62.) While the train was on Defendant Metro-North's New Haven line on Track 1, Plaintiff and Engineer Pilipaitis heard "what sounded like a scraping sound just under the Broadway Street Bridge," and Plaintiff said, "I bet you that's where we've been losing antennas, coming out to New York." (*Id.* ¶¶ 14, 63.) Plaintiff then looked out the rear window of Locomotive 4301 and turned on the light of his headlamp, which he was holding in his hand, and used it to look out the side window by shining the light upward toward where an antenna is located. (*Id.* ¶ 64.)

Shortly thereafter, Plaintiff stuck his head out the window of the moving locomotive. (*Id.* ¶ 15.) Plaintiff "struck his head on what was eventually determined to be a metal pipe hanging down from the catenary system under the Barry Street Bridge." (*Id.* ¶ 17.) Engineer Pilipaitis yelled to Plaintiff to get back into the locomotive. (*Id.* ¶ 16.) Defendants assert that Engineer Pilipaitis yelled to Plaintiff "[w]hen he" stuck his head out the window, but Plaintiff asserts that Engineer Pilipaitis yelled as his head was being struck by the pipe. (*Id.*)

Plaintiff's head "would not have made contact with the hanging pipe" if he had "kept his head inside of the moving locomotive." (*Id.* ¶ 24.) Plaintiff "was knocked unconscious and fell back into his seat, badly injured." (*Id.* ¶ 19.) Plaintiff "has no memory of" this accident

and "does not know exactly where his head actually made contact with the pipe" or whether "his head would have made contact with the hanging pipe" if Locomotive 4301 "had been lower." (*Id.* ¶¶ 21, 27.)

After Plaintiff's accident, a Metro-North trainmaster inspected Locomotive 4301 and observed that one of its antennas was broken. (*Id.* ¶ 68.) A piece of an antenna was found at the Broadway Street Bridge, but Defendants deny that it was definitively linked to the damaged antennas on Locomotive 4301. (*Id.* ¶¶ 69-70.) On March 11, 2017, a P&W engineer reported that the cab of Locomotive 4301 scraped the Broadway Street Bridge. (*Id.* ¶ 72.) Sometime thereafter, P&W decided to discontinue use of Locomotive 4301 on the Metro-North line. (*Id.* ¶ 74.)

Plaintiff asserts three claims. First, Plaintiff alleges that Defendant P&W was negligent in its operation of Locomotive 4301, in violation of FELA. (Second Am. Compl. [Doc. # 27] ¶¶ 16-19.) Specifically, Plaintiff alleges that P&W was negligent by failing to properly inspect Locomotive 4301 to be safe for operating, by carelessly using Locomotive 4301 when it was not safe for operating in the service to which it was put, by operating Locomotive 4301 even though P&W knew or should have known that its vertical height would cause an unnecessary danger of personal injury, by carelessly modifying the roof of Locomotive 4301 to cause an unnecessary danger of personal injury, and by failing to act in a reasonably prudent manner. (*Id.* ¶ 17.) Second, Plaintiff alleges that Defendant P&W operated Locomotive 4301 in violation of LIA in that it posed "an unnecessary danger of personal injury," "was not safe to operate in service to which it was put," and was not properly inspected for service. (*Id.* ¶¶ 20-27.) Third, Plaintiff asserts that Defendant Metro-North was negligent in inspecting and approving Locomotive 4301 for use on its New Haven line and in maintaining and ensuring a fifteen foot, six inch vertical clearance for use on that line. (*Id.* ¶¶ 28-32.)

## II. Discussion

Defendants argue that they are entitled to summary judgment in their favor because "nothing Defendants did or allegedly failed to do caused this incident," but rather, Plaintiff's accident occurred solely because of his decision to stick his head out the window. (Defs.' Mem. Supp. Mot. for Summ. J. [Doc. # 60-1] at 3.)

Plaintiff responds that whether Defendants "were negligent for operating a locomotive or allowing it to be operated with a vertical height that would not fit under an overhead bridge without [scraping] and damaging its antennas" and whether "any such violation or negligence played a part, no matter how small, in causing" his injuries are questions which should be left to a jury. (Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 67] at 1.) Plaintiff also argues that there are several disputed issues of material fact which preclude summary judgment, including whether the locomotive scraped the bridge, whether Plaintiff and Engineer Pilipaitis discussed the scraping sound and the antenna just before Plaintiff stuck his head out the window, whether Plaintiff looked out the window to see if the locomotive lost an antenna, whether any antennas were damaged or replaced prior to or as a result of his accident, and whether the same locomotive scraped the same bridge on a later trip. (*Id.* at 9-10.)

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks

omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id*. at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id*. (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id*. (citing *Celotex,* 477 U.S. at 324; *Matsushita,* 475 U.S. at 586).

### 2. LIA and FELA

The Locomotive Inspection Act permits a locomotive to be used "only when the locomotive . . . and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. Thus, no railroad carrier may "use or permit to be used on its line any locomotive unless the entire locomotive and its

appurtenances . . . [a]re in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb" and have been properly tested. 49 C.F.R. § 229.7.

The Federal Employers' Liability Act provides that "[e]very common carrier by railroad" engaged in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, . . . or other equipment." 45 U.S.C. § 51.

"In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). But "[c]ourts apply a more relaxed standard of both negligence and causation to FELA negligence than to those arising under common law," *Coale v. Metro-North Commuter R.R. Co.*, 621 F. App'x 13, 14 (2d Cir. 2015), because "the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues," *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438-39 (1958). "Thus, under FELA, an employer has a duty to provide its employees with a safe work place, which it has breached if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Tufariello*, 458 F.3d at 87. "The railroad's duties are measured by what is reasonably foreseeable under like circumstances." *CSX Transp. Inc. v. McBride*, 564 U.S. 685, 703 (2011) (internal quotation and alterations omitted). "Proof that the defendant railroad violated the LIA establishes such negligence per se." *Traylor v. Metro-North Commuter R.R.*, 2002 WL 31319923, at *2 (S.D.N.Y. Oct. 16, 2002) (citing *Urie v. Thompson*, 337 U.S. 163, 189 (1949) (concluding that "a violation of" the Boiler Inspection Act, the predecessor to the LIA, is "negligence per se").

6

The "test of a jury case" in a FELA action "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957). "Accordingly, . . . an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law." *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996). Although "but for" causation does not suffice under FELA, plaintiffs in FELA actions need not prove "proximate cause" as would be required in traditional tort actions. *McBride*, 564 U.S. at 688. Rather, FELA's causation requirement is satisfied "if the railroad's negligence played a part—no matter how small— in bringing about the injury." *Id.* at 705. Plaintiff need only present plausible evidence of causation to reach a jury, and "the right of the jury to decide questions of fact should also be liberally construed." *Ulfik*, 77 F.3d at 58.

Thus, in FELA cases, the "ordinary summary judgment standard is considerably more plaintiff-friendly," *Kendall v. Metro-North Commuter R. R.*, 2014 WL 1885528, at *2 (S.D.N.Y. May 12, 2014), and is "liberally construed in light of the strong federal policy in favor of letting juries decide cases arising under FELA," *Vasquez v. Metro-North Commuter R.R.*, 2014 WL 1344597, at *1 (S.D.N.Y. Apr. 4, 2014).

### B. Negligence

To prevail on any of his claims, Plaintiff must demonstrate that Defendants breached a duty owed to him. Thus, he must show either that Defendants "knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees, *Tufariello*, 458 F.3d at 91, or that they violated LIA.

Defendants argue they are entitled to summary judgment because even if Locomotive 4301 scraped the bridge as Plaintiff alleges, Defendants nonetheless did not violate LIA and were not otherwise negligent. According to Defendants, Plaintiff's allegation "that the locomotive's size was too large to travel on Metro-North's rail lines" is "in and of itself . . . not

a safety violation," did not create a "hazardous condition," and "posed absolutely no danger to 'life or limb.'" (Defs.' Mem. at 13.) In other words, Defendants argue that even if Locomotive 4301 scraped under bridges resulting in damaged antennas, it was nonetheless in "proper condition and safe to operate in the service to which" it was put "without unnecessary peril to life or limb," 49 C.F.R. § 229.7, and thus was not negligently operated or in violation of LIA.

Defendants argue conclusorily that Plaintiff lacks any evidence that "either the height of the locomotive or the alleged scraping sound . . . were unsafe or hazardous conditions," but they fail to explain precisely why a train's failure to pass under a bridge without scraping is not unsafe or hazardous. (Defs.' Mem. at 12-14; *see* Defs.' Reply [Doc. # 73] at 3.) In support of their position, Defendants cite *Traylor v. Metro-North Commuter Railroad* and *Varney v. Norfolk & Western Railroad Co.* (Def.'s Mem. at 13.)

In *Traylor*, the district court denied the plaintiff's motion for summary judgment because the plaintiff failed to show that, as a matter of law or undisputed fact, a "window in need of repair" "was unsafe to operate or that it presented an 'unnecessary' danger of personal injury." *Traylor,* 2002 WL 31319923, at *2. The plaintiff in *Traylor* "ha[d] not shown 'the absence of a genuine issue of material fact' as to whether the locomotive was safe to operate without 'unnecessary' danger of personal injury," and thus summary judgment in his favor was improper, especially because "[c]ourts that have been confronted with such issues under both the present and prior versions of LIA have typically concluded that they present questions of fact for the jury to decide at a trial." *Id.* But although the defect at issue in *Traylor*—a window in need of repair—was relatively minor on its face, Defendants have failed to explain how the alleged defect at issue in this case—a height issue which caused the train to scrape underneath a bridge while traveling—is comparably inconsequential. Moreover, although the *Traylor* court denied summary judgment to the plaintiff on that basis, it did not suggest that such a minor defect could not *possibly* form the basis of a FELA claim.

*See id.* Rather, it concluded only that the summary judgment record lacked evidence to "establish that the window was unsafe to operate or that it presented an 'unnecessary' danger of personal injury," and thus left the question of liability for the jury to decide. *Id.*

In *Varney*, an engineer alleged that when he removed a radio from one locomotive to transport it to another locomotive, "he found that the strap was broken," and later dropped the radio and was injured when he "twisted" in order to prevent the falling radio from striking him. *Varney v. Norfolk & Western R.R. Co.*, 899 F. Supp 280, 281 (S.D.W.V. 1995). The *Varney* court granted summary judgment for the defendant because it found "that a broken strap on a radio removed from a locomotive does not create an 'unnecessary peril of life or limb' as a matter of law," and that any argument to the contrary "defies logic." *Id.* At best, the court reasoned, "the condition of the radio handle required the plaintiff to hold the radio in a different manner in transit," but "this condition did not present an 'unnecessary peril of life and limb' sufficient to invoke the Boiler Inspection Act," the predecessor to LIA. *Id.* at 282. But contrary to Defendants' suggestion, the Court is not convinced that a train whose height caused it to scrape under a bridge while traveling cannot, as a matter of law, create an unnecessary peril to life or limb.

Plaintiff responds that, especially because FELA should be "liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment," *Lilly v. Grand Trunk Western R.R. Co.*, 317 U.S. 481 (1943), "[c]ommon sense dictates that" the failure of a locomotive to "fit under an overhead bridge without scraping" renders that locomotive unsafe to operate without unnecessary peril to life or limb (Pl.'s Opp. at 20.) Plaintiff relies on *Calabritto v. New York, N.H. & H.R. Co.*, 287 F.2d 394 (2d Cir. 1961) and *Whelan v. Penn Central Co.*, 503 F. 2d 886 (2d Cir. 1974), two cases where the Second Circuit concluded that evidence of oil and ice on a locomotive was sufficient to allow the cases to be submitted to a jury on the question of whether the defendant railroad was negligent. Plaintiff argues that just as "engine surfaces [must] be kept clear of slippery substances" even

9

though no specific safety rule outlines that requirement, "[l]ikewise, a locomotive must fit under an overhead bridge without scraping." (Pl.'s Opp. at 20.)

Especially in light of the standards governing FELA claims and the clear preference for permitting juries to assess employer liability, Defendants have failed to demonstrate that, as a matter of law, Locomotive 4301's height issues did not pose unnecessary peril to life or limb or that Defendants did not act negligently. Thus, Defendants have not demonstrated that they are entitled to summary judgment on this basis.

### C. Causation

Defendants argue that they are nonetheless entitled to summary judgment in their favor because Plaintiff was the sole cause of his injuries, and nothing Defendants did or did not do caused those injuries. (*See* Defs.' Mem. at 14.) Defendants explain that Plaintiff caused his own injuries because "nothing on Locomotive 4301 injured Plaintiff"; had Plaintiff "merely kept himself inside of [the] cab, he would not have been injured"; and "his injuries were caused exclusively by his head making contact with the pipe – not from anything on or attached to the locomotive itself." (*Id.*) Thus, according to Defendants, "[e]ven if P&W violated the LIA, . . . that violation did not cause [Plaintiff's] injuries." (*Id.*)

Defendants assert that the "scraping sound," which Plaintiff suggests prompted him to stick his head out the window, is "too far removed and too remote" from Plaintiff's injury to support a causation finding. (*Id.*) Defendants argue that the scraping of the bridge was "merely . . . a condition or situation in which the accident happen[ed] from other causes." (*Id.*) In other words, Defendants argue that the scraping was only a "but for" cause of Plaintiff's injuries, which is insufficient to demonstrate FELA causation under *Rogers* and *McBride*. Instead, according to Defendants, "Plaintiff's negligence alone was the sole cause of his accident" because he chose to "disregard railroad rules and safety practices and put his life . . . in danger by sticking his head out of a moving locomotive cab window under these

10

dangerous conditions," and because he would not have been injured "had he simply remained inside the locomotive cab." (*Id.* at 15-16.)

Defendants analogize to several cases where the defendant's negligence may have been a "but for" cause of the plaintiff's injury but did not meet the *McBride* causation standard for FELA actions. (*See* Defs.' Reply at 6-7.) In *Nicholson v. Erie R.R. Co.*, 253 F.2d 939, 940 (2d Cir. 1958), the Second Circuit affirmed the district court's dismissal of a FELA action after the close of evidence because the "causation requisite for recovery under the F.E.L.A. [wa]s lacking." In *Nicholson*, the defendant had failed to provide "women's toilet facilities" in the plaintiff's workplace, and the plaintiff was injured by a passenger's suitcase while searching for alternative facilities to use. The Second Circuit recognized that "[i]f defendant had supplied indoor toilet facilities plaintiff would not have been where the passenger's baggage struck her," but concluded that the defendant's failure to provide those facilities and the plaintiff's injury "were too far removed from one another in space and time to satisfy the requirements of the F.E.L.A." *Id.* at 941. Similarly, in *Moody v. Boston and Maine Corp.*, 921 F.2d 1 (1st Cir. 1990), the First Circuit found causation lacking where the defendant employer had caused the plaintiff to work long hours and get too little sleep, and plaintiff died of a heart attack four days after his most recent shift. In *McBride,* the Supreme Court cited both *Nicholson* and *Moody* as examples of FELA cases where "juries would have no warrant to award damages in far out 'but for' scenarios." 564 U.S. at 704. Defendants argue that the connection between any problems with Locomotive 4301 and Plaintiff's injury is similarly tenuous and "far out."

Plaintiff responds that there is "ample evidence" on which a jury could find that Defendants caused his injuries. (Pl.'s Opp. at 22.) Plaintiff argues that his case bears more similarities to cases which have been submitted to a jury to determine causation. In *Anderson v. Baltimore O.&R. Co.*, 89 F.2d 629 (2d Cir. 1937), the Second Circuit concluded that the question of causation should have been submitted to a jury where a railroad employee had

11

been struck by a passing train after getting off his train and walking along its side to remedy a malfunction which had caused the train to stop. The defendant in that case argued that the plaintiff's "own act in placing himself in a position of danger" was the sole cause of his death, but the *Anderson* court rejected that argument, reasoning that "his conduct was a normal reaction to the stimulus of a situation created by the defendant's violation of its statutory duty" under the Boiler Inspection Act. 89 F.2d at 631; *see also Richards v. Consolidated Rail Corp.*, 330 F.3d 428 (6th Cir. 2003) (reversing district court's grant of summary judgment for defendant because question of causation should have been submitted to jury where plaintiff was injured while walking the length of his train to determine the cause of an undesired stop); *Curran*, 161 F. Supp. 3d at 259-60 (denying defendant's motion for summary judgment and rejecting defendant's argument that only "but for" causation was present where plaintiff was injured while using a drill to repair problem allegedly stemming from defendant's negligence).

The Court agrees with Plaintiff that the facts of this case bear more similarities to *Anderson*, *Richards*, and *Curran* than to *Moody* and *Nicholson*. In *Moody* and *Nicholson*, the defendant's challenged actions set off a series of unforeseeable events which, in combination with external factors, ultimately led to the plaintiff's injury. But here, like in *Anderson* and *Richards*, a jury could find that Plaintiff's injury stems directly from his response to the problems with Locomotive 4301, even though he may have placed himself in some danger in responding as he did.

Separately, the parties also dispute Plaintiff's obligations under P&W's employee policies and the impact of those obligations on his claims. Plaintiff characterizes the policies as having imposed upon him a duty to investigate the scraping noise, including by sticking his head out the window. But Defendants argue that their policies prohibited Plaintiff from doing anything which might risk injury, and thus that his injuries stem entirely from his choice to disregard those policies.

Plaintiff suggests that by looking out the window to investigate, he "was performing an act in the course of his duty as a conductor that was a natural and not unusual act given the factual circumstances surrounding the incident." (Pl.'s Opp. at 22.) Plaintiff continues that it was a "normal human reaction for a train conductor to look out a window on a locomotive to investigate if the bridge the locomotive had just scraped under was damaging antennas." (*Id.* at 27.) Moreover, he argues, "engineers and conductors were permitted to look out the windows of moving locomotives." (*Id.; see* Ex. 2 (Pilipaitis Dep.) to Pl.'s Opp. [Doc. # 67-2] at 27 (Engineer Pilipaitis's testimony that he was not "aware specifically" of any rule prohibiting employees from putting their head out the window and that he did put his head out the window on occasion).) Plaintiff also argues that conductors were "required to protect company property, including radio equipment." (Pl.'s Opp. at 28; *see* Ex. 11 (NORAC Operating Rules) to Pl.'s Opp. [Doc. # 67-11] at 12 ("Company property must be protected. If Company property is endangered, employees must unite to protect it.").) Thus, Plaintiff argues, a reasonable jury could conclude that his choice to put his head out the locomotive window was a foreseeable reaction in fulfillment of his duties as an employee. (*See id.*)

In contrast, Defendants characterize Plaintiff's choice to stick his head out the window as "knowingly disregard[ing] safe railroad operating practices and procedure, as well as his training." (Defs.' Mem. at 15.) Specifically, Defendants argue that their policies prohibited Plaintiff from looking out the window as he did "because he was putting his life in jeopardy." (Defs.' Reply at 3; *see* Ex. 3 (Transp. Safety Rules & Procs.) to Defs.' Mot. for Summ. J. [Doc. # 60-4] at 13 ("You must use care to prevent injury to yourself or others. You must be alert and attentive at all times when performing your duties and plan your work to avoid injury. . . . You must protect your own safety.").) Defendants conclude that any requirement for Plaintiff "to look after his employer's property **does not** give him the right to put himself in harm's way." (Defs.' Reply at 5 (emphasis in original).)

13

But the approach urged by Defendants would seriously alter the relief available to FELA plaintiffs in a manner inconsistent with the goals and implementation of that statute. "[U]nder FELA, an employer has a duty to provide its employees with a safe work place, which it has breached if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Tufariello*, 458 F.3d at 87. Defendants' theory would permit employers to escape liability for failure to provide "a safe work place" simply by enacting employment policies which require employees to avoid injury and protect their own safety. Thus, under Defendants' theory, nearly any choice by an employee which might have increased the risk to his own safety would break the causal link and absolve the railroad of liability. Especially in light of the "considerably more plaintiff-friendly" summary judgment standard in FELA cases, *Kendall*, 2014 WL 1885528, at *2, the Court will not characterize Plaintiff's choice to put his head out the window under these circumstances as an unforeseeable violation of Defendants' vague employment policies as a matter of law.

Finally, Defendants argue that summary judgment is proper because Plaintiff's case rests too heavily on speculation and conjecture because Plaintiff "admitted that he did not know where he struck his head on the pipe so he could not say with any specificity and certainty that if the locomotive had been different dimensions he would not have been injured." (Defs.' Mem. at 17; *see also* Defs.' Reply at 2.) But the Court disagrees that it would be "pure speculation" to conclude that Plaintiff chose to put his head outside the train window in response to the train's scraping sound. Engineer Pilipaitis testified:

> We just heard something made contact, scraping. And we looked at each other and said "Did you hear that, I think something – I think we – I think we scraped the bottom of the bridge." And that led into the antenna. Because [Plaintiff] said "I bet you that's where we've been losing antennas, coming out to New York." . . . So he thought that's where we have been losing these antennas. And I agreed, I thought that made sense. . . . And 20, 30 seconds later, there's another bridge or set of bridges. And [Plaintiff's] window was already open. And he had his headlamp, not on his head, but in his hands, turned on. And as we came up to the next bridge – I believe it was the next bridge . . . I saw him

14

> getting his light ready. And he went out the window to look, you know, just to shine his light. . . . [H]e went like this, to shine the light up, to where the – because the antenna is right above the window. And that's when something hit him or he hit, you know – that's when he got injured.

(Pilipaitis Dep. at 14-15.) Engineer Pilipatis's testimony provides circumstantial evidence from which a jury could conclude that Plaintiff was endeavoring to investigate the scraping sound at the time of his injury, and thus, contrary to Defendants' suggestion, any such finding need not be based upon speculation.

Thus, Defendants have failed to demonstrate that no reasonable jury could find "that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers,* 352 U.S. at 506. The causal link between Locomotive 4301's height issues and Plaintiff's injuries is not so tenuous as to be merely "but for" causation. The "test of a jury case" in a FELA action "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id*. On the record before the Court, Defendants cannot show that "employer negligence" did not play "even the slightest" part in producing Plaintiff's injuries. Rather, especially in light of the liberal FELA standards on summary judgment, a jury should determine whether Defendants violated LIA or were otherwise negligent, and if so, whether such negligence played a causal role in producing Plaintiff's injuries.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. # 60] is DENIED.

                        IT IS SO ORDERED.

                        /s/
                        Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 3rd day of August 2020.